GATES RUBBER CO. v. B. F. GOODRICH RUBBER CO.

No. 8739.

District Court, D. Colorado.

Nov. 19, 1930.

A. J. O'Brien and W. F. Denious, both of Denver, Colo., for Gates Rubber Co.

Dines, Dines & Holme, Tyson Dines, Jr., and Robert E. More, all of Denver, Colo., and Merrell E. Clark, of New York City, for B. F. Goodrich Rubber Co.

SYMES, District Judge.

This is a patent infringement suit involving the two Gates patents; No. 1,354,738, a process for manufacturing endless V-shaped belts, dated October 5, 1920, application filed March 21, 1919; and No. 1,400,-539, for endless belts, dated December 20, 1921, application filed March 19, 1919. The complainant, the Gates Rubber Company, is the owner of both patents by assignment from its president, the inventor, Charles C. Gates.

For convenience, the first patent will be referred to as the process patent; the second as the product patent for an endless belt, manufactured according to the process set forth in the other patent. The defendant, the B. F. Goodrich Rubber Company, is the sales subsidiary of the B. F. Goodrich Company of Akron, Ohio, a large manufacturer of rubber products.

First. We will direct our attention to the so-called process patent, No. 1,354,738. The definition of, and considerable law applicable to, process patents, is found in Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034, and need not be quoted here.

The defendant is charged with contributory infringement of this patent, because it purchases and sells in this district, and elsewhere, endless belts made by the said B. F. Goodrich Company of Akron, Ohio, under a process alleged to infringe this patent. Its defenses are: (1) That the so-called Goodrich process does not infringe; (2) that the Gates patent is invalid for anticipation; (3) that, even if the Goodrich process does infringe, no cause of action arises against this particular defendant, because, while it purchases and sells belts made by the Goodrich Company, it does not manufacture, and has neither used the process, nor contributed to its use, so is not guilty of contributory infringement.

Defendant's answer to plaintiff's interrogatories admits it is a subsidiary corporation of the B. F. Goodrich Company, manufacturer of the alleged infringing belts, and sells as resale agent practically the entire output of belts made by said parent company, and none other, within this district and elsewhere. Attached to the interrogatories as part of its answer are three contracts between the two Goodrich Companies of successive dates. These disclose a very intimate and continuous business relationship existing since 1917.

Defendant relies upon the well-established rule that a patent for process only, as distinguished from a product patent, is not infringed by mere sale of the infringing article. Contributory infringement, such as is charged here, according to the authorities, is the intentional aiding by one party of another in the carrying out of an infringing act. The answers to the interrogatories, and the contracts above referred to, disclose a far closer relationship between the two Goodrich companies than that resulting from the mere sale of its product. Defendant's authorities on this point, therefore, are not applicable to the instant case. It is established that defendant agreed to, and has for many years devoted its sole efforts to, the promotion and sale of the products of the alleged infringer. It is required to sell a minimum of $35,000,-000 worth of its goods a year; to devote its best energies to the promotion of these sales throughout the whole of the United States as its exclusive territory; to take all its requirements of such merchandise from the parent company in a sum not less than $35,-000,000 a year. At one time the parent company even went so far as to guarantee that the defendant would earn a net profit of not less than 5 per cent. upon its outstanding

capital stock, etc. In another it recites that the goods required to be taken by defendant amounted to practically its entire output of these belts. These and other proven facts dispose of the claim that defendant merely buys belts of the parent company over the counter, from stock in hand, as other dealers might do. On this feature of the case General Electric Co. v. De Forest Radio Co. (C. C. A.) 28 F.(2d) 641, supports plaintiff's contentions. The chancellor will always disregard the corporate entity in determining the real relation between two corporations.

The process patent is for a method of forming endless belts—preferably of the so-called V-shape type; that is, having sloping side walls designed to contact with the adjacent sides of a grooved pulley, the inner face of the belt not touching the bottom of the groove, so that the belt tends to wedge into the groove, thus insuring a tight contact with the pulleys. Plaintiff's belt is used almost exclusively for connecting the fan of automobiles with the main shaft. The two pulleys that these belts work over are small and of different diameters. This service requires a belt that will not slip and capable of withstanding an unusual amount of flexing.

The Gates process is described in the patent as follows:

"My invention relates to a process of forming endless belts, preferably the V-type, or having sloping walls which contact with the adjacent sides of a grooved pulley, the inner face of the belt not touching the bottom of the groove, whereby the belt wedges in the groove and thus insures tight contact with the pulleys. The belt to be formed by this process * * * is composed of rubberized cords, or other suitable material, constituting the structural element, or the element which gives strength or backbone to the belt, while the wearing feature of the belt consists of rubberized woven fabric whose warp and woof form oblique angles to the direction of the belt."

The principal piece of apparatus used is a drum mounted on a revolving shaft (Fig. 1 of the patent), with a circular peripheral groove or cavity, having a cross-section suitable to give the belt the desired shape. A plurality of these drums may be mounted in series on the same shaft. Into this groove is first laid one or more strips of rubberized fabric, cut on the diagonal, so that its warp and woof extend at oblique angles to its length. This material lines the cavities and forms the outer covering of the completed belt. Next there may be wound into the groove on the cover strip one or more similar layers or strips of similar material. This second strip, however, is not essential. Then several convolutions of rubberized cord, or fabric, are conveniently wound into the groove on top of these strips. These cords running lengthwise form the neutral axis or backbone of the belt, and do not stretch when in use. In place of cords, rubberized woven fabric may be used, in which one set of threads extends in the direction of the belt, making this element non-elastic. Then the margins of the cover strip (the first strip inserted) are folded over each other, so that two or more layers of fabric are outside of the cord section. Next, layers of rubber may be placed in the outer portion of the cavity. The open periphery of this groove is closed with a convenient casing, so as to completely inclose the belt, which is then vulcanized. After vulcanization the casing is removed, and the drum, which is built in convenient sections, is so divided by the removal of one of the sections that the completed belt is easily slipped off sideways. In practice, the shaft is rotated and the sheets of rubberized fabric and the cords are conveniently and quickly wound into the grooves through the open periphery of the mold in the manner described.

When so operated, and as soon as the proper number of convolutions of cord are placed in the first cavity, the cord is automatically crossed over to the next cavity, as indicated (Fig. 22 of the drawings), and this operation continued until all the cavities are supplied with one or more convolutions of cord. As soon as this is done, the fabric, or cord, can be cut with knives arranged for that purpose, and the exposed ends properly placed in the cavities.

The object of applying the outer layer or layers of the rubberized fabric to the grooves of the drum, so that the warp and woof of the fabric form oblique angles to the direction of the belt, is to give the latter a limited degree of elasticity beyond and outside of the cords. This permits the flexing of the belt freely when bending over a small pulley it is designed to be used on, without in any way injuring the material thereof.

The so-called Goodrich process complained of follows the Delzell patent, No. 1,657,300, January 24, 1928 (Plaintiff's Exhibit 11), No. 2 of the appendix of drawings. The process there disclosed, having the product patents in mind, may be briefly described as follows: A smooth-surfaced building drum, freely rotatable, is set up on a station-

ary shaft, having its periphery slightly tapered toward one end, for the purpose of reducing the force necessary to roll the belt components upon each other, when such rolling takes place from the larger towards the smaller diameter of the drum, as hereafter described. Around the left end or largest diameter of this drum is laid flat and circumferentially a core-forming band of friction-coated or otherwise rubberized straight-laid thread fabric (12, Fig. 1). This piece extends around the drum, and is brought together in a loop splice, as indicated in Fig. 1.

Next to this is laid an inner or intermediate filler band (14), of square woven, bias laid, rubberized fabric, with its ends joined in a diagonal splice, preferably looped, the splice being stepped around from the splice of the left-hand band, so that the two will not overlap in the finished belt.

Next to this is placed the third element a band (16), of square woven, bias laid fabric, with its ends joined in a diagonal splice, preferably looped, and stepped around from the other two, for the purpose previously indicated. The fabric in this band may be somewhat thicker and of coarser mesh than the fabric in the band (14).

The three bands being thus laid upon the drum, and adjacent to each other, the belt is formed by first rolling by hand the core band (12) upon itself by a plurality of convolutions from the left end towards the right, then continuing the rolling to bring the said core upon the body band (14), and rolling said body band upon itself in a plurality of convolutions, and further continuing the rolling to bring this rolled-up core containing body upon the cover band (16), and rolling the latter on itself in a plurality of convolutions; the width of the cover band being preferably such as to form about two plies in the belt. The rolling is continued to the right until the belt is carried off the drum. It is then vulcanized into the cross-sectional form desired in the completed belt.

This belt is described as an endless, side-driving, vulcanized belt, with a central reinforced cord core, surrounded by a filler section consisting of a plurality of convolutions of bias laid rubberized fabric, transversely rolled upon itself, and a cover section surrounding said filler section, consisting of a bias laid rubberized fabric.

If I have correctly described the two processes, the distinction is obvious. In the Goodrich method the strips of material are laid out flat upon and around a smooth surface, stationary drum, and spliced. The drum is slightly tapered towards the right end, which has a slightly smaller diameter. While the drum remains stationary, these strips are rolled, as described, by hand, upon each other. The drum is not rotated. There is no successive placing of the different materials through the open periphery of a mold designed to shape the belt. On the contrary, the Goodrich process does not include the shaping of the belt. This step is accomplished in the course of vulcanization, after the process is really completed, while the Gates process shapes the belt in the course of its construction. I attach no importance to this, however, because in both the belts are completely assembled before they are vulcanized. That part of the process is old, and cannot form an integral part of either.

The Gates belt is built up step by step by placing the different elements through the open periphery of a circular mold. The use of the V-shaped cavity for determining the shape is emphasized (page 2, line 21, of the patent). Likewise rotation of the drum by mechanical means is necessary (page 4, line 13). One method may be said to be a hand process, using material in the form of sheets; the other is mechanical, in part, at least, using material in the form of strips. Neither the Gates or Delzell patents are foundation patents. Therefore, as is said in Royer v. Coupe, 146 U. S. 524, at page 530, 13 S. Ct. 166, 169, 36 L. Ed. 1073: "If this is a valid patent for a process, it must be limited to the precise, or, certainly, substantial, description which has been given in the specifications; and in order to constitute an infringement of that process a person must be shown to have followed substantially the same process, the same mode of reaching the result as is described in the specifications."

To put it another way: To constitute an infringement, the process must embody the same principles, or the same mode of operation, and accomplish the same result as another by the same, or equivalent, mechanical means. The two processes must be mechanically equivalent. Read Mach. Co. v. Jaburg et al. (D. C.) 221 F. 662.

Such is not the case here. I find no infringement.

### Product Patent 1,400,539.

The previous discussion is pertinent here without repetition. This invention relates to improvements in endless belts. Rubberized cords, or other suitable inelastic material, constitutes the structural element giv-

ing the strength or backbone to the belt, while the wearing feature consists of the rubberized fabric, whose warp and woof form oblique angles to the length of the belt, there being an outer layer of rubber, or rubber compound. This outer fabric holds the belt in the desired form, and forms a wearing surface for the transmission of power.

The charge against the defendant is that it has, within six years prior to the filing of the bill, sold and caused to be sold in Colorado and elsewhere endless belts that infringe this patent.

The defendant admits the sales, but says the claims of this patent are absolutely anticipated by several prior patents, principal reliance being placed upon the Gammeter patent, No. 1,277,711 (Appendix 3 and No. 6 of Defendant's Exhibit L). The Gammeter belt, like the Gates, is an endless, vulcanized belt, made of rubberized cords covered with bias cut fabric, and vulcanized. Here the similarity ends. In most other respects it radically differs from the Gates belt.

The object of the Gammeter patent, according to its statement, is to produce a practically nonstretchable, flat, endless belt, the body consisting of a series of strands of rubberized fibrous cords, laid closer together, side by side, preferably in a single row only. Novelty is also claimed, in that the cord is mechanically stretched as it is wound into position on the drum form used, thus taking the stretch out of each strand separately. A flat belt must be stretched before it can be used successfully.

Later it is stated: "The successive strands of cord are wound in close contact side by side, and after a single row has been completed, and the end severed, the margins of the fabric strip forming the outside of the cover, are closed over the row of cord-strands and overlapped."

Another clear difference between it and the Gates belt is shown by the following extract: "A single row of cords gives the belt greater flexibility than plural rows, or bundled parallel strands."

And claim is made: "1. The method of making a flat, endless belt, which consists in winding a rubberized, fibrous cord under strong tension, in a series of adjacent convolutions on a support," etc.

In fact, all the claims include the winding of the rubberized cord under strong tension, or, in the alternate, the use of stretched rubberized cords.

The Gammeter belt has no side walls, and it would seem that none other than a thin, flat belt could be produced under the methods described in this patent. Furthermore, a wide, thin belt containing a single row of cords only, placed side by side, could not, as counsel argues, be molded or pressed into a V-shaped belt, capable of operating over a pulley designed to contact the sides of the belt, instead of the inner surface.

When in use, the inner flat surface of the Gammeter belt is held in contact with the sheaves or pulleys that it connects by friction. There is no wedging action. The shape of the Gates belt is that of a trapezium; that is, V-shaped, and its undersurface does not contact the pulley, but instead the two inclined sides, or walls, engage the corresponding inclined sides of the V-shaped groove in the pulleys, with which the belt co-operates. This results in a pronounced wedging action, which, it is claimed, gives a superior traction, especially where the number of degrees of contact of the belt with the sheave are fewer than in the ordinary arrangement, and is of advantage in the work that the Gates belt is designed for, to wit, to connect the driving shaft of an automobile with the fan belt and the generator or pump, making a three-point drive, the pulleys of which are of comparatively small diameter. This necessarily reduces the arc of contact of the belt with each pulley, and emphasizes the value of the wedging action referred to. It may also be observed, a flat belt which stretches in use will slip and not function properly, whereas any stretching of a V-shaped belt merely increases this wedging action without affecting its function.

This wedging effect gives the Gates belt a grip that offsets the fact that, when it is used, as it generally is, on small pulleys, it has a comparatively small contact with the total circumference of its pulleys. A flat belt must have a tight contact with a larger sector of the circumference of its wheel or pulley in order to function efficiently. Further, the inelastic portion or backbone of the Gates belt constitutes a small part of its cross-section —hence its flexibility—while in the Gammeter belt nine-tenths of the cross-section is made up of comparatively inelastic material inclosed in an elastic covering. The flexibility of the Gammeter belt is due to its thinness, and it would seem that the addition of another row of cords necessary to make it V-shaped would destroy this pliability.

Reference is made to the fact that in the Gates application it is stated that the appel-

lant should not be limited to the exact cross-section described, as he may desire to manufacture belts of slightly different shapes from the V-shaped belt disclosed. This language, however, cannot be construed to constitute a claim for a thin, flat belt, similar to the Gammeter.

It is argued that mere difference in shape is wholly immaterial from the standpoint of invention. Generally speaking, this is true, but in the case at bar it is important, because a trapesium-shaped belt and a flat belt cannot be used interchangeably. As shown, they require different kinds of pulleys and perform their functions in a different way; the former relying upon the wedging and side contact with the sides of a V-shaped pulley, with the inner surface not touching, while, in the latter, the broad, flat inner surface contacts with a flat pulley, or sheave, its function being performed by friction.

The Lycett, British patent No. 6846 of 1912, cited as constituting a further complete anticipation of the Gates claims, is not an endless belt. The invention has reference to driving belts of the kind made up of a core of rolled or folded rubbered canvas, surrounded by a wrapping of suitable material, and designed for motorcycles.

The core is composed of a wrapping of special fabric and rubber, the fabric being of comparatively wide-open texture, the threads being one-eighth of an inch apart in each direction, formed by folding rubber fabric upon itself backwards and forwards. Around this is wrapped a cover consisting of a sheet of the canvas impregnated with rubber under pressure in a more or less plastic state. The result is really a rubber belt—strengthened, as the inventor says, by the strands of the fabric which pass through the rubber. Its sides are of plain rubber instead of the fabric found in the Gates belt. While the product may be said to be V-shaped, we are not informed whether in use the sloping side walls or the flat inner face engage the pulley.

Of most of the other patents cited as anticipating the Gates, it may be observed generally on this record that none have ever gone into practical use, and while "We do not doubt that a patent which was never manufactured at all may serve as a complete anticipation, if it sufficiently discloses identity;

but cases like the present give the proper field for the full effect which can rightly be carried by the deprecatory designation 'paper patents.' If earlier patents show a close analogy, with differences which, according to our present light, hardly seem material, and yet it appears that such a patent, or a succession of them, never found any commercial favor, this fact has evidential force to indicate that the differences are more important than they seem, and that the relatively slight later changes and adaptation to a different demand have a valid claim to inventive character." Wellman-Seaver-Morgan Co. v. William Cramp & Sons Ship & Engine Bldg. Co. (C. C. A.) 3 F.(2d) 531, at page 532.

The Gates patent has for years enjoyed a great commercial success in a highly competitive field. It is a general rule that the issuance of a patent creates a presumption that the qualities essential to patentability are present in the subject-matter, and the grant of a patent is prima facie evidence of patentability. Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885. These presumptions should be given more than mere formal recognition, Railroad Supply Co. v. Hart Steel Co. et al. (C. C. A.) 222 F. 261, rev. on other grounds 244 U. S. 294, 37 S. Ct. 506, 61 L. Ed. 1148, especially where, as in the case of this patent, the file wrapper discloses a most thorough examination by the Patent Office, and the consideration of other similar patents, including the Gammeter, No. 1,256,011. The defendant has the burden of proving the invalidity of a patent. Marvel Equipment Co. v. Merit Oil Equipment Co. (D. C.) 29 F.(2d) 308, and see generally, Black & Decker Mfg. Co. et al. v. Baltimore Truck Tire Service Corporation (C. C. A.) 40 F.(2d) 910.

It is not necessary to discuss the defense of laches other than to say that it is not sustained by the period of time alleged to have elapsed, or by the authorities.

My conclusion is that none of the patents cited as anticipating perform the same function in the same way that the Gates product patent does, and that the defendant is guilty of infringement of the product patent.

Counsel may submit findings of fact and conclusions of law thereon, in accordance with equity rule 70½ (28 USCA § 723).