**ETHYL CORPORATION, Plaintiff,**

v.

**HERCULES POWDER COMPANY, Stauffer Chemical Company, and Texas Alkyls, Inc., Defendants.**

**Civ. A. No. 2142.**

United States District Court
D. Delaware.

Dec. 5, 1963.

Supplemental Opinion July 1, 1964.

Arthur G. Connolly and Januar D. Bove, Jr., of Connolly, Bove & Lodge, Wilmington, Del., John W. Nields and William T. Lifland, of Cahill, Gordon, Reindel & Ohl, New York City, of counsel, for plaintiff.

William S. Potter, of Berl, Potter & Anderson, Wilmington, Del., Theodore S. Kenyon, Malvin R. Mandelbaum, Charles R. Brainard and Joseph A. Barbosa, of Kenyon & Kenyon, New York City, of counsel, for Hercules Powder Co.

John J. DeLuca, Wilmington, Del., and Kenyon & Kenyon, New York City, of counsel, for Stauffer Chemical Co.

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Kenyon & Kenyon, New York City, of counsel, for Texas Alkyls, Inc.

CALEB M. WRIGHT, Chief Judge.

Plaintiff, Ethyl Corporation (Ethyl), has brought suit seeking declaratory and injunctive relief in a case involving the license of certain patent rights. Defendants, Hercules Powder Company (Hercules), Stauffer Chemical Company (Stauffer), and Texas Alkyls, Inc. (Texas), have counterclaimed for patent infringement. The matter is now before the Court on cross motions for summary judgment. The parties have stipulated the facts.

The main issue raised is whether or not the licensing of a process patent may be used to prevent the sale of products manufactured by the licensed use of the patented process when such products are themselves unpatented.

The license granted Hercules encompassed both exclusive and non-exclusive rights. It conveyed a non-exclusive right to make, use and sell the products resulting from the patented process in Canada and the United States, and an exclusive right to sell one of the products produced by the patented process in the United States.

The licensing agreement with Ethyl granted a right apparently more limited conveying merely a non-exclusive right to make and use in the United States the product produced by the patented process and a non-exclusive license to make, use and sell in Canada.

Some background material may be helpful.

Dr. Karl Ziegler of Germany discovered processes by which the production of aluminum trialkyls was made possible at low cost. Due to Ziegler's discoveries aluminum trialkyls have now become of commercial importance.

Ziegler's early work permitted him to achieve a strong patent position in this country. The application for Ziegler Patent No. 2,826,598 was filed June 17, 1952 with claims for processes for the preparation of certain aluminum trialkyls and a product claim reading upon such trialkyls. Process claims eventually issued. A product claim remained in the appli-

cation until October 2, 1957, when it was cancelled. Ziegler also has obtained another process patent, United States Patent No. 3,032,574, which defendants claim is infringed by plaintiff's use of the patented process beyond the limitation of its license.[1] To the present time Ziegler has not received a patent on the product produced by use of the patented processes in issue.

Ziegler capitalized on his patent position by licensing American companies under his patent rights. In 1954 he granted Hercules a non-exclusive license to use the process and to make, use and sell products resulting from that use. He also granted Hercules an exclusive license to sell aluminum trialkyls in the United States. For a time Hercules, itself, manufactured and sold aluminum trialkyls. In 1959, Hercules agreed with Stauffer to form Texas. That company now manufactures aluminum trialkyls with Stauffer acting as its exclusive sales agent.

In 1958, Ethyl Corporation, the plaintiff in this action, became interested in using Ziegler's patents and carried on negotiations looking to that end. These negotiations culminated in an agreement of October 6, 1958 in which Ziegler granted Ethyl a non-exclusive license to make and use aluminum alkyls in the United States and to make, use and sell them in Canada.

The main thrust of this litigation concerns the validity of Hercules' exclusive license to sell aluminum trialkyls and the breadth of Ethyl's license to make and use in the United States.

Ethyl claims that the language granting Hercules an exclusive license to sell an unpatented product is ineffective. Process patents, Ethyl asserts, cannot be relied on to enforce an exclusive right to sell the unpatented article produced by the process. Hence, Hercules' license is ineffective insofar as an exclusive right

to sell is conveyed and Ethyl cannot be prevented from selling unpatented aluminum trialkyls.

Acting in accordance with this theory, Ethyl has been making and selling substantial quantities of aluminum trialkyls in the United States since 1957. In this action, Ethyl seeks a declaratory judgment to the effect that Hercules' exclusive right to sell is invalid. Ethyl also asks the Court to enjoin Hercules, Stauffer and Texas from representing to potential customers for aluminum trialkyls that only Hercules has the right to sell aluminum trialkyls produced by the Ziegler process in the United States. Hercules, with the approval of Ziegler, counterclaims for patent infringement claiming Ethyl's license grants it the right to use the Ziegler process to make aluminum trialkyls in quantities sufficient only for its own consumption and that by selling to others it has violated its licensing agreement.

■ In Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1941), the Court said:

"The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to * * * Inventors the exclusive Right * * *' to their 'new and useful' inventions. United States Constitution, Art. I, § 8, cl. 8; 35 U.S.C. § 31. But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant."

1. In response to inquiry by the Court, Ethyl, by its attorneys, while protesting the necessity of doing so, admitted that "Ethyl's current manufacturing opera-
tions for the production of aluminum trialkyls do embody a process covered by one or more claims of Ziegler's Patent No. 3,032,574." See Exhibit 71.

This salutary rule applies to process patents as well as product patents. By a mere agreement, an inventor cannot extend the scope of the monopoly granted under the patent laws of the United States.

A product patent and a process patent are two different things. The former applies to a discovered article, the latter applies to a new method of making an article. "Thus a process patent is not infringed by the sale of a product made by the process, the product itself not being patented, and a product patent is not infringed by one who uses the process by which it is made, the process itself not being patented." In re Amtorg Trading Corporation, 75 F.2d 826, 832 (C.C.P.A.1935); cert. den. International Agricultural Corp. v. Amtorg Trading Corp., 296 U.S. 576, 56 S.Ct. 102, 80 L.Ed. 407 (1935). See also Foster D. Snell, Inc. v. Potters, 88 F.2d 611 (2 Cir. 1937); Gates Rubber Co. v. B. F. Goodrich Rubber Co., 45 F.2d 652 (D.C.Col.1930), rev'd. on other grounds B. F. Goodrich Rubber Co. v. Gates Rubber Co., 54 F.2d 580 (10 Cir. 1931).

Through restrictions on the use of his process, of course, the holder of a process patent may exert control over the end product.[2] He could, for example, refuse to allow the use of his process at all and thus keep the product produced by that process off the market. See Toulmin's, Anti-Trust Laws of the United States, Vol. 4, § 7.3. One court has held that he may limit the number of articles produced by his process because this is a valid exercise of his process patent rather than an invalid attempt to limit the sale of unpatented articles, Q-Tips, Inc. v. Johnson & Johnson, 109 F.Supp. 657 (D.N.J.1951), aff'd. 207 F.2d 509 (3 Cir. 1953), cert. den. 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954).

But by granting a license which purports to give an exclusive right to sell an unpatented article, Dr. Ziegler has overstepped his rights under the patent law. He can restrict the use of his process, but he cannot place controls on the sale of unpatented articles produced by the process.

Dr. Ziegler does not have and has never had the right to exclude others from selling aluminum trialkyls. He could not convey such a right to Hercules. His attempt to do so in the license agreement of 1954 is an invalid attempt to extend the monopoly granted to him with regard to the Ziegler process under the United States patent law.

Granted that such a conveyance of an exclusive right to sell an unpatented product produced by a patented process is ineffective it does not render the entire Ziegler-Hercules contract invalid. With the provision for the exclusive right to sell aluminum trialkyls excised from the contract there remains to Hercules the unrestricted right to use the process. Hercules, therefore, can make all the aluminum trialkyls it can sell in the market. Nor does the abortive conveyance of rights outside the patent under the circumstances of this case warrant the invocation of the doctrine of patent misuse against these defendants and Dr. Ziegler.

Dr. Ziegler attempted to convey something he did not have. But there was no attempt to create a monopoly by tying arrangements or price fixing. In fact, there was no effort made to create a monopoly which did not already exist by reason of the grant to Ziegler of his process patent. As long as Ziegler had a valid patent on the only known process by which aluminum trialkyls could be produced commercially Ziegler could control the commercial production of the unpatented product by the legitimate manipulation of his patent monopoly. Ziegler cannot do what he attempted, not because the public interest philosophy of the patent or antitrust laws forbids it, but solely because the patent laws encompass only

---

**2.** This would be especially true in the case of a patentee who, like Ziegler, owns a patent on the only process by which a certain product may be produced commercially.

that which is set forth in the patent claims. Absent a product claim no product monopoly exists. Any control over the unpatented product exists merely as a by-product of a process patent. It is not within the protection of the patent monopoly and thus not a property right subject to grant.

Although Ziegler attempted to do that which he was incapable of legitimately doing, the application of the doctrine of misuse is too drastic. The misuse doctrine is essentially an equitable doctrine which attaches to the guilty party the stigma of unclean hands. When a patentee has used his patent in an unlawful attempt to secure a monopoly on an unpatented article, the Courts will refuse to hear him plead that his patent has been infringed. Until he has purged himself of the misuse, the alleged infringer may set up the patentee's own misuse as a defense. See Toulmin's, Anti-Trust Laws of the United States, Vol. 4, § 7.31; see also Morton Salt Co. v. G. S. Suppiger Co., supra; Motion Picture Patents Company v. Universal Film Manufacturing Company, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931); Leitch Manufacturing Co. v. Barber Company, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938).

There is a legal distinction between misuse and antitrust violation, but the misuse decisions are "deeply suffused" with the antitrust philosophy, Neale, The Antitrust Laws of the U.S.A., 295. The line between antitrust cases and cases which are bottomed on the philosophy that the patentee's attempt to widen the scope of his legal monopoly is contrary to some other public policy is not always sharply defined. See Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944). See also Schueller, "The New Antitrust Illegality Per Se", 50 Columbia Law Review 171, Note 64 Harvard Law Review 626.

In the second Mercoid case, Mr. Justice Douglas went so far as to say, "The legality of any attempt to bring unpatented goods within the protection of the patent is measured by the anti-trust laws not by the patent law." Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., supra, 320 U.S. at 684, 64 S.Ct. at 280, 88 L.Ed. 376.

Whether or not misuse is essentially a part of the patent law or the antitrust law the underlying basis for employment of the doctrine is apparent. The public policy demands that the legal monopoly permitted inventors under the patent law be not extended to encompass unpatented products outside the monopoly of the patentee's patent.

As the cases cited above indicate, the misuse question arises most frequently in the context of tying arrangements where the patentee requires that users of his patented article must also use an unpatented article of the patent holder's manufacture. In these cases the patentee clearly attempts to reach out to embrace two monopolies where in law he has only one. This element of reaching out for a *new* monopoly is common to the misuse cases; and it is this factor which distinguishes what Ziegler has done from the cases where the misuse doctrine is applied. In Ziegler's unique position, by granting an exclusive right to sell the product, the inventor gains nothing which he could not have achieved by manipulations of his process patent without resort to tying arrangements or price fixing. Ziegler could have controlled sale of aluminum trialkyls by limiting use of his process as readily as by expressly controlling their sale.

Since Ethyl cannot insulate itself from the force of the Ziegler-Hercules counterclaim, that counterclaim will be examined next. Although Ziegler could not legally convey an exclusive right to sell aluminum trialkyls to Hercules, his attempt to convey such an exclusive right indicates his intention to give Her-

cules the sole right to sell aluminum trialkyls in the general market. In his license agreement with Ethyl, Ziegler authorized Ethyl to "make and use" aluminum trialkyls made by the Ziegler process, but he did not authorize Ethyl to sell those products. Ziegler could not authorize Ethyl to sell because he thought that he had already granted that exclusive right to Hercules. It is apparent that Ziegler anticipated that Ethyl should have a captive use. In telling Ethyl that it could "make and use", Ziegler meant to permit Ethyl to manufacture a quantity limited by the amount that Ethyl could use itself. By selling in the open market then, Ethyl has violated its license agreement with Ziegler.

As a final argument, Ethyl contends that even if it does not have the right to make aluminum trialkyls for general consumption, it can make aluminum trialkyls for the use of other Ziegler licensees. It cites as a proposition of law that a licensee having the right to manufacture has inherently the right to have the product involved manufactured for it by others. For this proposition it cites Johnson Railroad Signal Co. v. Union Switch & Signal Co., 55 F. 487 (3 Cir. 1893); Marconi Wireless Telegraph Co. of America v. Simon, 227 F. 906 (S.D.N.Y.1915), aff'd. 231 F. 1021 (2 Cir. 1915); and Westinghouse Electric & Mfg. Co. v. Cutting & Washington Radio Corporation, 294 F. 671 (2 Cir. 1923).

The proposition of law which Ethyl urges, while correct as a general rule, at least with respect to the manufacture of a product, is nevertheless subject to variation by the express terms of the contract or the intent of the parties. See Radio-Craft Co. Inc. v. Westinghouse Electric & Mfg. Co., 7 F.2d 432 (3 Cir. 1925), see also Westinghouse Electric & Mfg. Co. v. Tri-City Radio Electric Supply Co., 23 F.2d 628 (8 Cir. 1927).

The contract itself is not clear as to the right of Ethyl to use the Ziegler process to manufacture aluminum trialkyls for other Ziegler licensees. Nor can the intent of the parties be gleaned from the supporting documents submitted as exhibits on the present motion. Therefore, this phase of the case is not in proper posture for disposition on summary judgment.

Let an order be submitted in accordance herewith.

### Supplemental Opinion

In a previous opinion in this case the court held that the owner of a process patent (Ziegler) could not grant an exclusive license to sell the product produced by the process. Therefore, the court reasoned, that as a matter of patent law Ziegler's grant to Hercules Powder Company (Hercules) of an exclusive right to sell aluminum trialkyls was ineffective. It did not, however, hold the Ziegler-Hercules contract invalid, but only that Ziegler had attempted to convey more than he owned.[1]

Ethyl now maintains that the previous decision of this court brings into operation Article 6, paragraph 3 of the Ziegler-Ethyl license which provides:

"3. If at any time Licensors obtain by any means the right to grant a license to anyone to manufacture and sell Aluminum Alkyls in the United States, Licensors have the absolute obligation to forthwith grant a non-exclusive license to Licensee to manufacture and sell Aluminum Alkyls in the United States under the patents and Patent Applications of Licensors."

---

1. "Ziegler cannot do what he attempted, not because the public interest philosophy of the patent or antitrust laws forbids it, but solely because the patent laws encompass only that which is set forth in the patent claims. Absent a product claim no product monopoly exists. Any control over the unpatented product exists merely as a by-product of a process patent. It is not within the protection of the patent monopoly and thus not a property right subject to grant." See court's previous opinion in this case filed Dec. 5, 1963, p. 458.

The defendants [2] contend that they still have exclusive rights under the Hercules-Ziegler contract, and that the plaintiff, Ethyl Corporation (Ethyl), may not manufacture aluminum trialkyls for sale under its own license from Ziegler which grants only a non-exclusive right to make and use aluminum alkyls, i.e., the right to make the amount it needs for its own purposes.[3]

The court is therefore called upon to interpret the Ziegler-Hercules agreement as it now stands. The purpose of interpretation is to find the intent of the parties. Corbin, Contracts, § 538. Here the intention of the parties is clear.

Although the exclusive right to sell aluminum trialkyls was held invalid, Hercules sought and Ziegler granted such an exclusive right. The holder of a process patent who licenses the use of his process may control that use absent tying arrangements or other agreements violative of the antitrust laws. He may go so far as to limit the number of articles produced by his process, or limit production to one of the two or more articles that may be manufactured by the process. Q–Tips, Inc. v. Johnson & Johnson, 109 F.Supp. 657 (D.N.J.1951), aff'd. 207 F.2d 509 (3 Cir. 1953), cert. den. 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954). As the court stated in its previous opinion, as long as Ziegler had a valid patent on the only known process by which aluminum trialkyls could be produced commercially, Ziegler could control the commercial production of the unpatented product by the legitimate manipulation of his patent monopoly.[4]

Ziegler's attempt to grant Hercules an exclusive right to sell and Hercules' bargain for that right clearly indicates the intention of the parties.

Although Ziegler could not effectively grant Hercules an exclusive right to sell the unpatented product, he could grant the exclusive right to use his process for the purpose of manufacturing aluminum trialkyls for sale.[5] Such a grant would give to Hercules the right to exclude others from using his process to make the product for commercial sale. The court finds that the license agreement should be so interpreted.

Since Ziegler has granted Hercules an exclusive right to use his process for the purpose of making aluminum trialkyls for commercial sale, he cannot grant to Ethyl a similar right, and he has no duty to perform his "absolute obligation" under Article 6, paragraph 3 of the Ziegler-Ethyl contract.

Previously when these parties were before the court, Ethyl argued that even if it did not have the right to manufacture and sell aluminum trialkyls in the commercial market, it did have the right to manufacture aluminum trialkyls for other Ziegler licensees under the terms of their respective licenses.[6] At that time the court held the matter not in proper posture for determination by summary judgment. Ethyl was permitted re-argument with respect to this phase of the case.

Re-argument and further opportunity for reflection have not changed the view the court previously expressed on this phase of the matter.[7] Indeed, further reflection has convinced the court that it is

2. All of the defendants will hereafter be referred to collectively as "Hercules". Their relationship is set forth in the prior opinion.

3. Ethyl's non-exclusive right to make and use aluminum alkyls encompasses the right to make and use aluminum trialkyls.

4. Opinion filed Dec. 5, 1963, p. 458.

5. Ethyl or anyone else has the absolute right to manufacture and sell to whom it may please aluminum trialkyls produced by any non-infringing or unpatented process.

6. The license arrangements before the court other than the Hercules-Ziegler agreement are the licenses between Ziegler and Koppers Company, Inc. (Ex. 64), Monsanto Chemical Company (Ex. 65), E. I. duPont de Nemours and Company (Ex. 66), and Ethyl (Ex. 51).

7. See opinion filed Dec. 5, 1963, p. 459.

doubtful that a "case or controversy" exists between these litigants with respect to the right of Ethyl to manufacture for other licensees of Ziegler under their licenses. Even if justiciability were present, this court would not exercise declaratory jurisdiction in this instance since an adjudication would serve no useful purpose.[8]

First, Ethyl claims that it has been damaged because Hercules has represented to potential customers of Ethyl that only Hercules has the right to sell aluminum trialkyls. If we may make for Ziegler licensees under their licenses, argues Ethyl, then Hercules may not make such a representation. But Ethyl has overlooked the key word, "sell". The court has found that Hercules has an exclusive right to make aluminum trialkyls for the purpose of *sale*. Therefore, Hercules' representations are justified. The transaction of which Ethyl speaks, the making of aluminum trialkyls for other Ziegler licensees under their own licenses, would not be a sale. Hercules has not represented to potential Ethyl customers that Ethyl may not make for other licensees under their own licenses. All that Ethyl attacks is Hercules' claim that Ethyl does not have the right to use the Ziegler patented processes to manufacture aluminum trialkyls for sale. Hercules has the right to make this claim by virtue of its exclusive license to use the Ziegler patents in suit to make aluminum trialkyls for sale.

Second, Ethyl asserts as a defense to Hercules' charge of patent infringement that it has not infringed because it has the right to make for Ziegler licensees under their own licenses.

The Hercules counterclaim for patent infringement seeks damages because of Ethyl's illegal *sale* of aluminum trialkyls. The transaction which Ethyl asserts as a defense is not a sale.

The court need not decide the right of Ethyl to make for Ziegler licensees under their licenses when that right, even if given the judicial seal of approval, would not serve Ethyl as a defense to a charge of illegally *selling*.

Ethyl has argued that its license to manufacture and use carries with it the right to sell what it makes without limitation. The court has held otherwise. This is the sole controversy which involves Ethyl and Hercules. Whether Ethyl can make for other licensees of Ziegler under their licenses is of no concern to Hercules. The only parties who are concerned are Dr. Ziegler and his licensees other than Hercules who might seek to retain Ethyl or some other licensee to make aluminum trialkyls for them under their licenses.

Hercules has not challenged or disputed Ethyl's right to manufacture for other licensees under their licenses. Ethyl's rights in this regard are not threatened by Hercules.[9] Nor is there any indication that Ethyl will be drawn into legal conflict should it continue to assert that it may traffic in aluminum trialkyls in this limited manner. "The declaratory judgment is not designed to remove or lessen the requirement of standing and its use still demands, as does 'normal' litigation, adverse parties." [10] Ethyl must show the court more than the shadow of an adversary before the court will find a justiciable controversy.

Submit order.

8. See 6 Moore's Federal Practice § 57.20, p. 3121.

9. See Defendant's Brief of March 12, 1964, p. 27.

10. Note, Judicial Determinations in Non-adversary Proceedings, 72 Harvard L. Rev. 723, 729, (1959).